First up is Krista J. Peary. May it please the Court, Krista Peary for appellants Anne Harding, Gregory Jacobs, Peter Schroer, and Holly Metamorse. There are three sizable racial minorities in Dallas County, African American, Hispanic, and Anglo. Dallas County only considered the voting rights of two of these three groups when it drew the 2011 Commissioner's Court map because it operated on the erroneous principle that Section 2 does not apply to Anglo voters. In so doing, Dallas County violated both Section 2 and the Equal Protection Clause. Beginning with Plaintiff's Equal Protection Claim, the District Court erred by dismissing a claim that was fairly pled, had put the parties on notice, and is perhaps the easiest conceptual hook to understand the error in Dallas County's race-based conduct here. Plaintiffs clearly alleged an equal protection clause. that this was portrayed as a racial gerrymandering argument. Indeed, when Dallas County first moved to dismiss this claim, it addressed the Fourteenth Amendment claim solely as a racial gerrymandering claim, arguing that they could satisfy a strict scrutiny and that we hadn't alleged predominance. We responded, equally discussing the racial gerrymandering claim, and the District Court denied the motion to dismiss. You'll acknowledge that Paragraph 31, and I realize you probably didn't draft this, but Paragraph 31 sounds more like dilution. It uses the language of intent, but intent is wrongly called intent. But intent is part of a dilution. Right. Correct. And it also says that the map did not regard traditional neutral redistricting principles, which is a classic predominance inquiry. We also believe that the District Court made too technical of a distinction between the nature of these two claims here. Essentially, a Fourteenth Amendment violation is when the state uses race inappropriately and can't justify it. Malintent, you know, intent to harm, is one way that a plaintiff can prove an equal protection violation, but it's not the only way. Miller v. Shaw expanded the universe of plaintiffs' claims, but didn't create an entirely separate cause of action. In both cases, plaintiffs seek the same relief, that the map be enjoined as unconstitutional. Finally, in many ways, excuse me, Dallas County undisputedly used race in the creation of this map. This isn't a case where you're looking at a race-neutral map that you would have to show that the lines are more likely caused by race than not. They admit to the DOJ that three of the four districts were drawn as minority opportunity districts, and therefore the entire question here hinges on strict scrutiny. We argue that Dallas County possibly satisfied strict scrutiny, given their misunderstanding of Section 2. Even if a statute can ever justify violation of the Constitution, it must at least be a reasonably necessary interpretation of that statute, as this Court and the Supreme Court have held multiple times. Because Dallas County only considered the rights of two of three groups, that can't possibly be a reasonably necessary interpretation, and we ask this Court to remand this claim for the District Court to address in the first instance. If the Court has no further questions, I'll turn to our Section 2 argument. The District Court exclusively and erroneously addressed whether the plaintiffs' demonstrative district would, in fact, perform for Anglo voters. There are a series of problems with the Court's analysis, but I'll start at the end. Even if everything else the Court did was correct, a single reconstituted election return with a margin of 1 to 2 percent is the opportunity to perform, to suggest that because a sheriff candidate once lost by 2 percent does not mean that no Republican voter will ever win in that district's election. In essence, the District Court, although they used the word opportunity, sought certainty that the new district would elect the Anglo candidate of choice. Such a standard would be impossible to prove without involving the judiciary in the process of identifying safe, racially segregated districts. Do I understand your—let me start over—I'm looking at footnote 18 of the District Court opinion, and it looked like you wanted to have a chance to respond to this evidence of the 2016 elections, and you simply were not given a chance to rebut? Is that— The evidence came too late for our expert to perform an in-depth analysis. Is that what you're asking? Is that one of the remedies you're asking from this Court, is simply a chance to rebut that? Absolutely. We would like to—we would like this Court to narrowly remand—reverse this case and we can actually prove all three prongs of jingles, as well as the totality of the circumstance. We believe that performance is best understood as a remedy phase issue, in which case we will absolutely seek to rebut that evidence. Is it a remedy phase issue, or is it now a liability phase issue under Abbott? Abbott does not—should not be read to silently abrogate the remainder of the Supreme Court's voting rights jurisprudence. I think it must be read in the context of its facts, in which plaintiffs' expert expressly disclaimed that there was a legal map that could perform. Abbott also uses the word perform, but doesn't define it as anything in particular, which suggests to me that the normal standard of potential to perform or of opportunity per the text of Section 2 still governs. When you say the plaintiffs in Abbott disclaimed, is this—is the distinction you're drawing that there it was essentially admitted, whereas here it's simply not proven by the plaintiff? There it was— Is that the distinction? Yes. Here we believe we have put forth relevant proof. We think the evidence that supports jingles, prongs 1, 2, and 3 are the requisite proof of performance. Right, but it sounds like Abbott—one theory of Abbott would be that it's creating this new standard of performance, right? In other words, jingles 1, 2, and 3 are certainly required, but you now need more under Abbott. At most, it should be considered under a totality of the circumstances analysis. The district court did not address any other circumstances. And if you would like, on the current record, we think that the defendants' expert analysis does in fact show the opportunity to perform under a correct legal understanding of what it means to perform, as well—and there is other circumstantial evidence. For example, Mike Cantrell's letter at the time—it was his district—his letter suggests that he believed the district could continue to perform for several cycles, which we think also would be relevant to this claim. Your point then is you would like a chance to satisfy this new Abbott standard, and we're simply not given a chance. Do I understand Abbott came down after kind of—I don't remember the timing of this When did Abbott come down vis-a-vis the trial? I believe after trial, but before the district court's opinion, but I can double-check that. I mean, I know Abbott was cited by the district court. Correct. We think, first, we would like the opportunity—our first argument is that legally, Abbott didn't change anything, and what matters is the jingles prongs, which we have proven. In the alternative, we would be happy to make our arguments about the possibility to perform again in front of the district court, along with the remainder of the totality of the circumstances. That the district court was willing to assume that we had met all three jingles factors and nevertheless dismissed the claim is usually a rare event. It is the rare case that satisfies jingles one through three and doesn't otherwise successfully state a claim. It would be fair, though, to read Abbott as essentially trying to make—sort of toughen what it takes to prove a Section 2 claim? I don't think that's a fair interpretation of Abbott. I think Justice Alito is applying existing law to one particular fact pattern, determining that the district court erroneously found— I guess when he focuses on the fact that the plaintiffs admitted lack of performance, I know Justice Sotomayor certainly took issue with that, but the point is, it seems like performance now matters, whereas perhaps it didn't matter before. Isn't that the new standard? I don't believe it's a new standard. The ultimate question has always been dilution, which requires some causation analysis. That was true before Abbott, and it remains true after Abbott. It's not that performance never matters. The question is, how does one go about proving it? And we think that satisfying the bright-line rules of jingles is what plaintiffs need to do in order to satisfy performance. In other words, once you prove one through three of the threshold factors, that's performance? Correct. That's performance. Okay. But it seems like it's changed now, right? Because under—in Abbott, I think, if I read Alito correctly, you've got the three prongs, but then you have this separate analysis of, gee, you actually admitted that even though you might have established the three prongs, you admitted that you're not sure it's going to work anyway. I know Sotomayor says that's a mischaracterization, but that seems to be Alito's analysis. If that's how you read Justice Alito's opinion, then I think it is still just a part of the totality of the circumstances analysis. The Supreme Court, on appellate review, addressed the one issue they found most compelling. That doesn't suggest that that's the only thing that the district court should examine as part of their intensely local totality of the circumstances analysis. And here we think that totality must include the fact that only two of three groups were even considered, making it, in a zero-sum electoral map, very likely that you diluted the votes of the group that wasn't attempted to be maximized by the county. If the court has no further questions, we have our remaining time. Thank you. Mr. Dunn. May it please the court. My name is Chad Dunn, and I, along with Mr. Hebert and Mr. Rios, represent Dallas County and the elected members of its Commissioner's Court in this case. I'll begin my argument addressing some of Ms. Perry's points, and in particular the first point that she made to this court, that I'll have to strongly but respectfully disagree with. It is not correct to say that the district court found that Section 2 doesn't apply to Anglo citizens and is not available to them to pursue a claim. The district court— I think her point was—maybe I misheard—I think her point was that Dallas County acted as if whites were not protected by the voting rights laws. Well, perhaps I misheard the comment, but it's no question that the district court found Section 2 is available to Anglo plaintiffs. What do you draw from the fact that, as I understand it, Commissioner Price remarks that all of you are white, go to hell, and refers to one white commissioner as honey boo boo? Does that reflect animus? That—not in the course of discussion of redistricting, no. That was not the issue. But I encourage the court, if it's concerned— I'm sorry, you're saying that's not animus, or that that comment wasn't connected sufficiently directly to a redistricting act? I'm saying that wasn't during discussion of redistricting. Okay. But you'll concede those are racial statements? I'll concede that those are racial statements, but I will also add, and if the court has any concern at all about those statements, it should watch the videos which are in the record that Judge Fitzwater watched in the trial of this case. And what preceded those—and I'm not trying to justify the comments— but what preceded those was several of the individuals associated with these plaintiffs, in fact called as witnesses by these plaintiffs at the trial, gave speeches to the court and referred to Commissioner Price as a chief mullah on numerous occasions. One witness after another came before the open mic and referred to Commissioner Price as the chief mullah, chief mullah, chief mullah, repeatedly. And ultimately he lost—I would say he would probably concede he somewhat lost his cool, and he responded, well, you're all white, as a reaction to what he thought was a racial term. At that point, the county judge adjourned the meeting, given the tensions on all sides, and as Mr. Price—and this is shown in the video—as Mr. Price is leaving the chamber and trying to exit the situation, he is pursued after by the same individuals, as I mentioned, that testified in this case. So there's a lot to unpack there, but Judge Fitzwater says in a footnote that ultimately because there is no effect, there's no discriminatory effect here, that getting into that evidence was unnecessary to resolve the case. Now I want to get at this point of the continuance or the opportunity to rebut, and I want to answer a couple of the questions, Judge Ho, that you posited. The first is the trial in this case was in April. Abbott came out in June. The Judge Fitzwater's decision was in August. That's the timeline. Judge Fitzwater's decision addresses Abbott extensively over the course of about two pages, pages 28 and 29, as I recall. And so it is true that it was considered by the district court in this case, but Your Honor asks should they be presented an opportunity to go back to the district court and present evidence. Right, because the question is did plaintiffs have the opportunity to satisfy this new rule, assuming that Abbott is, in fact, establishing a new rule. And this is a point I'm going to agree with Ms. Perry on. Abbott v. Perez on this point was nothing new. The court has on numerous occasions addressed this functionality, but I want to address it first with the standard. Well, I think in fairness, though, what she's saying is it's not changing the standard at all and that therefore there is no – that essentially they satisfied the preexisting law. Well, we disagree with the satisfied part, but we agree with the standard didn't change in Abbott. And so in Lulac v. Perry, for example, does – I mean, do I understand correctly that at least before Abbott, once you've satisfied – forget prongs two and three for a moment – once you've shown a 50.1 percent district, obviously it's large and it's compact so that you can draw that district, you've got the potential and potential is all you need. You don't need a guarantee. I'll have to respectfully disagree with you, Your Honor. I think both the Cooper and the Lulac v. Perry Supreme Court cases talk about functionality and the need to prove it. But I'm going to go even earlier than that, which is the language of the statute, which I'll quote to you, subparagraph B, section two, the plaintiffs have to prove that they have less opportunity to participate in the political process and to elect representatives of their choice. Now, Jingles was an effort to come up with a test to meet the statutory language, but the language has always been there. The plaintiff has to show that something the defendant did gave them less political opportunity. So if you have a case where it's a 50.1 percent Hispanic opportunity district, that's not enough? That the Hispanic plaintiff has to show our turnout is going to be enough to actually perform? The plaintiffs will have to show they can construct a district that will allow them to elect a candidate of choice. Right, but not just the district, but you have to actually show performance, that 50.1. As I understand it, there are cases where it's 50.1 percent and that's it, even though you could assume that turnout may not meet it, may never meet it. So maybe I'll address it this way, maybe this will be helpful. There's a continuum of districts. You have influence districts, right, where you don't have the opportunity to elect, but you can influence. You have opportunity districts, and then you have guaranteed districts. Somewhere on that continuum, I'll agree there are some gray lines, but they don't exist in this case because the plaintiff put on no evidence whatsoever of performance. And this court says in Bartlett v. Strickland, there's no obligation under section two to create influence districts. But you have to have opportunity districts, and the plaintiff has to meet their burden to do so. Fitzwater says, Judge Fitzwater says in his opinion, it's not that there's competing evidence about whether or not this district can be drawn. There is no evidence from the plaintiffs that the district can be drawn and performed. And it wasn't just on the election results, as Ms. Perry mentions, the reconstituted elections. It also had to do with a detailed analysis, Judge Fitzwater makes, of each of the precincts that the plaintiffs moved around to construct their new district. And what he identified was that the precincts that he included in that district were Anglo, but they were Democratic-leaning Anglo districts. And individuals they took out of the district were often Anglo Republicans. That's why their second district doesn't perform, and neither does the first. And as long as we're talking about this possibility of remand feature, the census data that came out in 2011 shows that approximately 200,000 Anglos had left the county. The growth had been in the African-American and Latino community. All of the ACS data since then shows a continued reduction, both in percentage and real numbers, in the Anglo population. If this court were to remand this case, the 2018 evidence is going to show that every single Democrat run all four of these districts. So there's no remedy the court can get to at this point, even if they were able to have done so back in 2011. Well, I understand that your expert presented to the court two data points from 2016. Had it also analyzed other data points, but for whatever reason didn't present those? I'm not sure that's true, Your Honor. I thought I saw that in the record. I may be mistaken. No. My understanding from the testimony of the experts is they picked particular races that they usually pick to make these analyses, and that's the data that they presented. But this gets at the point as to whether or not the plaintiffs need a last-minute or ninth-hour continuance to go back and address this issue. That was a question, Judge Ho, that you asked. And I want to point the court to ECF 113 in the district court opinion. In the district court file, it's March 20, 2018. And in there, Judge Fitzwater deals with a motion by these plaintiffs complaining about the supplemental report of the defendants that deals with this brand-new election data. And he makes a series of rulings. He allows some of the data and doesn't allow some of the others. But he specifically says in there this is without prejudice to plaintiffs seeking a continuance for them to produce their own report. But at this point in March of 2018, the elections had been in November of 2017. This data had been available to both parties. And if the plaintiffs had wanted to make a report of it, they could have. But my point for today's purposes is that Judge Fitzwater says, I'll entertain a continuance if that's what you want. And the plaintiffs didn't come forth with it. And this isn't the first time that the plaintiffs had an opportunity to pursue a claim on the Shaw issue. And back in April 4, 2016, the defendants, this is at ECF 20 in the district court file at page 13, filed a motion to dismiss. And in the motion to dismiss, we argued that there was an equal protection claim that was a vote dilution claim. And then we say in there, but to the extent they purport to plead a Shaw claim, they also cannot prevail under that. So at least as of 2016, the plaintiffs had noticed that defendants didn't believe they had pleaded a Shaw claim. But that's not the end of the story. So then in March of 2018, about a month and a week or so before the trial is going to begin, Judge Fitzwater issues his motion for summary judgment ruling. And in there he finds that the plaintiffs haven't pleaded a Shaw v. Reno racial gerrymandering claim. This decision about the lack of pleading requirement by the plaintiffs was within days of the judge saying, but I'll entertain a continuance on your expert reports if you want to consider this new data. So what do the plaintiffs do? They don't respond under Rule 15 or 16 with a motion to amend their complaint. They don't file a motion with the judge during the trial or even orally ask the judge during the trial for a trial amendment to bring a Shaw v. Reno claim. And none of their expert reports up to that point had any of the things in it that you would expect in a Shaw v. Reno case. The reality is, I heard your earlier argument that this case is a lot similar. It has evolved over time. It started as a Section 2 challenge that Section 2 wasn't available to Anglo plaintiffs, so it must be unconstitutional. Then it turned into a run-of-the-mill Section 2 vote dilution redistricting case. And now before this court, it sounds like it's turned into, well, it should have been a Shaw v. Reno case all along. Now any other plaintiffs that came to this court under Voting Rights Act protection talking about redistricting, at this point in the game, it's over. You've pleaded the case that you pleaded. It was tried. You had many opportunities to ask for different claims, and you didn't do it. Turning to the pleading issue, why is paragraph 17 not enough? I'm reading the second amended complaint. So in addition to the fact that the judge told them five weeks out it's not enough and they didn't seek to amend, Perez v. Perry, the three-judge district court case in San Antonio, addressed a very similar issue. Judge Fitzwater cites that opinion, quotes from it in his decision, and says that Shaw v. Reno is an, quote, analytically distinct equal protection claim. Justice O'Connor says that in Shaw. Miller, that case, says it again. It's an analytically distinct claim. So what these plaintiffs are asking the court to decide is that claim number two in the complaint was actually claim number two and three. And as this court has said in several opinions, I like this one. It's an unreported decision, McLean Food Service. Judges are not pigs sweeping for truffles buried in complaints. And that's exactly what is being asked of this court here. It doesn't say Shaw v. Reno. It doesn't say political gerrymandering. It talks exclusively about vote dilution. But in any event, if there was some legitimate confusion about it, a motion should have been filed long before now with the district court asking for an amendment and for it to be heard. And again, I don't want to belabor this point, but we are so far down with American Community Survey data from 2011 that the possibility of a remand for a remedy, much less another liability trial, that this district is going to perform for anybody is next to zero. All right, I'd like to move on to the Section 2. Surely you concede 2016 was unique in many ways. It seems like in my recent lifetime every one of these elections has been unique. Fair enough. Fair enough. But, I mean, if we're going to shut down a claim that the district court acknowledged or at least stipulated met all three conditions and that furthermore typically those three conditions are dispositive, although there is technically a totality analysis, it's a pretty slender read, isn't it, to just focus on that, what many people would regard as one of the most unique election cycles in our country's history. Well, I'm going to have to disagree with it. He said, I'm going to assume for the purposes of the. . . Right, but the point is. . . I didn't analyze them. Fair enough. But whatever language assumed, stipulated, the point is the case is postured in a format where those three are presumed, assumed to be satisfied, and yet it's being thrown out based on this one unique cycle. Well, I'll have to disagree with that as well. There was election data submitted throughout the cycle about the performance of the district, and plaintiffs had the burden and they offered no evidence. And again, as I mentioned, it's not just the election results. The judge went and carefully looked at each of the voting precincts, credited the testimony of plaintiff's or defendant's expert, Matt Engel. I'm sorry, am I missing. . . I apologize if maybe I'm misunderstanding something. I thought 2016 was the only evidence that the proposed map would perform. There was. . . I'm sorry, the only evidence from you all that the proposed map would not perform. Are you saying that you actually presented other cycles besides 2016? Well, I think that that is true. The reconstituted election results were from 2016. My point, I guess, is the analysis. . . It's not just that, though, which I feel like Your Honor is suggesting. It's also the analysis of the individual voting precincts, which did analyze election data throughout the decade. So it's true the reconstituted elections were 2016 alone. And if lightning struck in 2016 and that was special and different, then Your Honor's point is well made. But the rest of the analysis is also still true. The individual voting precincts that were moved in to make the so-called New Opportunity District are Democratic precincts. They may be majority white, but they vote Democrat, and they have all through the decade. And Judge Fitzwater has found that. And so, and I'll point, there was a. . . Under the remedial plan, it is true. . . I'm sorry, I want to give you a fair chance. It is true that it looks like all Democrat under the remedial plan. But it's 50.6, 50.8. That suggests that a different turnout model from 2016 could theoretically swing it to the preference that they're alleging. Am I. . . If we were going to sit. . . I mean, you'll admit those are very small margins, obviously, 0.6 and 0.8. Here at the Court of Appeals, if we were going to sit as fact finders, one could conclude that's a different turnout model. One could also conclude, which is what Fitzwater alluded to in his opinion, is that the white population has continued to decrease in the county over the course of the decade. And there was a supplemental. . . As long as we're talking about the potential of reopening the evidence, the supplemental reports of the plaintiffs show that continue to be true. It was true in 2018. Every Democrat we've looked at won all four of these districts that the plaintiffs posit in 2018. So if the idea is we'll send it back because there was something special in 2016, it didn't change in 2018. You're saying you're destined to win with more data. That's right. But I don't think the court even has to get to that point because the reality is that the plaintiffs carry the burden of proof. I've either read or was involved in every Section 2 redistricting case that this court has issued, and I have never seen a plaintiff come to court with this evidence and prevail. It's not because these plaintiffs are white. It's not because they're pursuing Republican districts. It's because the well-established law since at least the 1980s required the proof of certain elements, and they didn't have it. And I want to move on from the factual finding of performance, which, as I suggested, isn't a new test, but talk about some of the other errors in the record here. The first is that the plaintiff's expert used the wrong map. He redrew in his own testimony the county's map, which had been provided to him in a shapefile. Instead of using the shapefile, he redrew it using whole precincts and then proceeded to posit that the county's map split all these cities. But he had to concede at trial because he used the wrong map. He was incorrect about his list of split cities. And then on top of that, in the e-mail traffic between plaintiff's expert and apparently some advisor at the Rand Corporation that was helping him, they talk about let's draw a district where around the perimeter we'll decant, this is his word, Hispanic areas of white population to try to get a district that's majority white. And he talks about let's not rely upon, let's not worry about city splits, let's not worry about keeping whole voting precincts, let's focus exclusively on drawing a racially drawn map. If there's a racial gerrymander in this case, it's the ones that the plaintiffs asked this court to impose. That map and the plaintiff's own expert didn't comply with traditional redistricting principles. In fact, the plaintiff's expert testified that the man that he had drawing the map wasn't even provided the redistricting principles that the commissioner's court had adopted. And in the Harris County Rodriguez case, this court said that even a liability-level map has to comply with the principles that the commissioner's court adopts insofar as is possible. There was no effort to do so at all here. I want to say something finally about totality of the circumstances, and Judge Ho, you correctly noted Judge Fitzwater didn't get into the totality of the circumstances. So even if the court is to find that somehow that these plaintiffs don't have to prove a functional district, despite the clear language under Section 2, the case would need a remand in order for the district court to go through the totality of the circumstances and determine in that local appraisal that the Supreme Court asked for whether or not a remedy is justified. The last point I want to hit is an issue... Let me ask a quick question. I apologize. You undoubtedly know more Section 2 law than I do, so I want to ask you this question. What is the burden on the plaintiff at the liability stage to produce a performing map? They must produce a map that shows opportunity. Again, on the continuum, there's influence, opportunity, and guarantee. Plaintiff doesn't have to show guarantee, but they do have to prove opportunity. So does the court have the option of saying, I find liability, but at the remedy stage, your map doesn't perform, but I'm going to provide a new map that would perform, and that's the relief we're giving you? Well, that's not what the Supreme Court did in Abbott v. Perez. I'm just asking about just Section 2 law. Is that an option, or is the court bound to essentially either grant relief on the proposed map, or sorry, you lose, and that's all I'm going to do? The court is bound to, in the liability stage, as a plaintiff, you must show opportunity to elect in your district. Now, at the remedy stage, they can construct a different district, but you have to prove it at the outset. I want to also mention that there is no injury that has been pleaded by these plaintiffs that are redressable. They are without standing in this case. For all of the foregoing reasons, Judge Fitzwater's decision was absolutely correct, and it deserves its affirmance in every respect. Thank you, sir. Ms. Perry, you have five minutes on rebuttal. Thank you, Your Honor. First, I'd like to address the standing point. Plaintiffs have proven that they are members of the relevant minority, that they live in districts that have been packed and cracked on the basis of race, and that a new map would resolve their injury if the district court correctly found their standing. If Abbott changed the law, then we certainly deserve a chance to address that change on remand. If it did not, and what matters is if we've already proven performance, their evidence proves that opportunity to perform. Record on Appeal 5829-30 is the colloquy in which the Dallas County's expert admits that he ran analysis of the county judge races, which actually sits on the Commissioner's Court, and the Texas gubernatorial race, and did not include those in its report. We think that's probative evidence that perhaps those outcomes came our way. You don't know? Pardon? You don't know? You have not had a chance to internally do your own... No, we don't. Were you not able to? We learned that he had ran those specific elections at trial. No, I'm sorry. I meant, is this something that you all could have done on your own? Forget their evidence. We certainly could have had an expert address reconstituted returns. We didn't, given our understanding of the law. We could on remand. Your understanding of the law pre-Abbott was what, that once you do the three jingles factors, you're done? Correct. Okay, and then after... I'm told that's not how it is. Of course, right, but then after Abbott, now it's more you have to actually show performing maps. Correct, which makes sense, because the demonstrative map may never end up becoming the remedy. So whether that map performs is not the operative question. That's a tool to demonstrate that you have a sufficiently numerous and compact racial minority. Also, if you use just 2016 elections, it shows the Democrats winning every state house race in Texas. So there is some uniqueness in that data. Secondly, the plaintiff's map doesn't have to meet the intent standards of the government's map. Judge Higginbotham's opinion in Clark v. Calhoun makes that very clear, 88F3rd at 1407. Your Honor, correctly anticipated one of my objections, which is that our argument is not that the district court didn't understand that Section 2 applied to all racial minorities, but that Dallas didn't. During trial at 5572 through 77, Dallas County's agent testified he did not understand Section 2 to apply to the Anglo minority at the time he was working on the maps. Finally, with regard to the equal protection claim, that one claim is analytically distinct does not create a heightened pleading standard. There's no need to amend, there's no exhaustion requirement here. We received an adverse judgment from the district court, made a strategic decision to continue with the remaining claims as the district court saw the case, and that judgment is now properly before this court on appeal. And finally, equal protection claims do not require the same showing of discriminatory effect that a Section 2 claim does. The Supreme Court has made clear that the harms at issue in an equal protection claim are the racial sorting itself, the stigma and the stereotyping that comes with that sorting, as well as the inference that your representative might only be standing up for one racial subgroup. For these reasons, we ask this court to reverse and remand. Thank you very much.